# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMUEL TAYLOR, | ) | |
| Plaintiff, | ) | Civil Action No. 10-139 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL BARONE, et al, | ) | Magistrate Judge Susan Paradise Baxter |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Susan Paradise Baxter[1]

Plaintiff Samuel Taylor brings suit alleging that Department of Corrections Defendants violated his constitutional rights by failing to protect him from an inmate-on-inmate attack that occurred at SCI Forest. Plaintiff claims that this assault was in retribution for testimony he gave against a fellow pretrial detainee in a capital murder prosecution. Presently pending before this Court is Defendants' motion for summary judgment. The motion is fully briefed and is ripe for disposition by this Court.

**Plaintiff's Factual Allegations**

    **1) General**

Plaintiff Samuel Taylor was jailed at the Philadelphia County Jail awaiting trial on burglary charges. Around the same time, Kareem Glass, a well-known narcotics drug dealer in the Philadelphia area, was charged with homicide. While the homicide charges were pending

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment.

1

against him, Glass hired Donte Thomas to murder a witness scheduled to testify against him and Thomas did so. Thomas was then arrested for homicide and was jailed in the same facility as Plaintiff. Thomas approached Plaintiff and solicited him to kill more witnesses who were scheduled to testify for the prosecution in the criminal case against Glass.

Plaintiff informed his attorney about the solicitation and Plaintiff's attorney advised the Philadelphia District Attorney's Office. Plaintiff fully cooperated with prosecutors and eventually testified against Thomas at his homicide trial, where Thomas was convicted and sentenced to death. Thomas is presently awaiting execution.

Following Plaintiff's conviction for burglary, he was assigned to SCI Camp Hill for classification pending assignment and transfer to another prison within the Pennsylvania Department of Corrections system. Out of concern for Plaintiff's safety, the prosecuting attorney in the successful capital murder prosecution against Thomas, wrote to Defendant Donald Kelcher, Superintendent of SCI Camp Hill. In pertinent part, the letter dated October 30, 2007, reads:

> … Inmate Samuel Taylor was sentenced to serve four to ten years' incarceration for multiple counts of Burglary by the Honorable Judge Pamela Prior Dembe. He is currently housed at SCI Camp Hill awaiting classification.
>
> Prior to his sentence, Mr. Taylor had testified on behalf of the Commonwealth in the matter of <u>Commonwealth v. Donte Thomas</u>, on which I was the prosecuting attorney. This matter was a capital homicide in which Mr. Thomas was convicted of killing a witness on another separate homicide (<u>Commonwealth v. Kareem Glass</u>, pending trial and in local custody) and given a sentence of death. Mr. Taylor testified that Donte Thomas had solicited him to kill even more witnesses on his case.
>
> **While Mr. Thomas is currently in segregated custody, our confirmed information is that both he and Kareem Glass (the friend for whom Thomas killed a witness) have a great deal of influence and connections, both inside and outside the prison system. In addition to the murder of one witness, we are currently investigating a number of incidents where local Corrections**

2

> **Officers and inmates have threatened and assaulted the witnesses against Mr. Thomas and Mr. Glass.**
>
> **While my office will remain diligent in seeking separation orders whenever possible, this protection will be insufficient to protect against other third parties whom Mr. Thomas and Mr. Glass could solicit. Both my office and Judge Dembe feel very strongly that additional steps must be taken to assure Mr. Taylor's safety.**
>
> To that end, I would like to request that Mr. Taylor be housed in a facility where he will be least likely to come into contact with people who may seek to put him in harm's way, such as SCI Laurel Highlands. I am also open to any other options you may have which you believe will keep Mr. Taylor safe.

ECF No. 68-1, pages 1-3 (emphasis added). Assistant District Attorney Barry concluded the letter by offering his office and cell phone numbers as contact information.

Superintendent Kelcher and his staff did not undertake measures necessary to protect Plaintiff nor did they alert others within the Department of Corrections of the grave risk of danger to Plaintiff. Following the completion of the Department of Corrections' classification process, Plaintiff was assigned and transferred to SCI Forest, a facility that houses violent offenders. In January 2008, Lehman and Miller approved the transfer, ignoring the warnings from Assistant District Attorney Barry to Kelcher about the risks to Plaintiff's safety.

After being convicted of homicide, Glass was sent to SCI Camp Hill around October 2008 and was transferred to SCI Forest, where he was assigned to General Population, in January 2009.

### 2) Allegations Against SCI Camp Hill Defendants (Kelcher, Henry, Lubinski, Lehman, Miller and Brandt)[2]

Plaintiff claims that the SCI Camp Hill Defendants did not do enough to protect him.

---

[2] The Amended Complaint identifies: Donald Kelcher as the Superintendent; Tim Henry as Director; Brian Lubinski as a counselor supervisor; Timothy Lehman as the counselor assigned to assist Plaintiff; Ross Miller as a counselor supervisor; and Tanya Brandt as an employee entrusted with entering separating orders in inmate's files. ECF No. 51, ¶¶ 11-16.

Plaintiff alleges that each of the SCI Camp Hill Defendants deliberately disregarded the mortal danger to Plaintiff, and each refused to undertake measures necessary for his protection including:

- They failed to alert others within the state prison system to the need to keep Plaintiff separate from Glass;

- They failed to place a separation order in Plaintiff's record, noting the need to protect Plaintiff from Glass; and

- By reason of their refusal to assign Plaintiff to a facility such as SCI Laurel Highlands with a non-violent prison population, Defendants Kelcher, Lehman and Miller evidenced a deliberate disregard for Plaintiff's safety and the mortal danger to which they had been alerted by ADA Barry.

ECF No. 51, ¶ 45.

### 3) Allegations Against SCI Forest Defendants (Barone, Wojcik, Ennis, Riskus, Whitman and Fry)[3]

Around March 24, 2009, Plaintiff noticed Inmate Kareem Glass walking to the cafeteria and overheard him instructing his companions to locate Plaintiff who was "a rat." Plaintiff immediately approached his counselor, Defendant Whitman, and alerted him about Glass's presence and the risk of danger that posed to Plaintiff. Defendant Whitman ignored Plaintiff's request for immediate protective measures and directed Plaintiff to submit a request slip formally requesting an appointment with him.

Thereafter, Plaintiff approached Defendant Officer Fry and explained the situation and the danger it posed. Fry responded that Plaintiff had only himself to blame, since Plaintiff had chosen to testify against Glass.

---

[3] The Amended Complaint identifies: Michael Barone as the Superintendent; Edward Wojcik as the Deputy Superintendent; Major Ennis as a major in Unit Management; T. Riskus as a captain in correction; Mr. Fry as a corrections officer; and Mr. Whitman as a counselor. ECF No. 51, ¶¶ 5-10.

4

Next, Plaintiff wrote to Defendant Superintendent Barone explaining the situation and the danger from Glass and others. Barone did not intervene to afford protection to Plaintiff, but he instead sent a written reply directing Plaintiff to contact his counselor for assistance.

Plaintiff sent a written request slip to Whitman requesting an appointment but Plaintiff received no response. Approximately a week later, Plaintiff went to Whitman's office without an appointment. After explaining the danger he was in, Whitman alerted Security Captain Defendant Riskus. Whitman refused to do anything further, but told Plaintiff that if he continued to hear reports that Glass had hired people to kill him that he should contact Whitman again.

Plaintiff requested that Defendant Riskus transfer him to another institution due to the need to be protected not only from Glass but also from Glass's confederates. Instead, Riskus indicated that he would transfer Glass.

Glass was confined to isolation, but Glass's confederates were left in general population where they continued to pose a threat to Plaintiff. Plaintiff continued to hear reports from his acquaintances that Glass had hired people to kill him. On April 14, 2009, Plaintiff again sought help from Whitman informing him that Glass had solicited associates to murder Plaintiff. Whitman refused to help. Around this same time, Plaintiff sought help from Officer Fry who also refused to help.

On April 16, 2009, Plaintiff was attacked and stabbed by three people, one of whom called Plaintiff "a rat" just prior to the attack. Plaintiff alleges that

> [f]ollowing Plaintiff's request for assistance after discovering Glass within the same general prison population in March, 2009, each of the SCI Forest Defendants refused to undertake measures necessary for Plaintiff's protection, which measures should have included immediately removing Plaintiff from the general prison population and placing him in administrative protective custody until he could be transferred to another safer facility.

ECF No. 51, ¶ 49.

Defendants move for summary judgment against the allegations of the Amended Complaint on the basis that there is no evidence that they were deliberately indifferent to a substantial risk of harm to Plaintiff.

**Standard of Review under Federal Rule 56**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under Rule 56, the district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 quoting F.R.Civ.P. 56. However, "if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will not." El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007).

The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex, 477 U.S. at 330. See also Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004). When a non-moving party would have the burden of proof at trial, the moving party has no burden to negate the opponent's claim. Celotex, 477 U.S. at 323. The moving party need not produce any evidence showing the absence of a genuine issue of material fact. Id. at 325. "Instead, ... the burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. After the moving party has satisfied this low burden, the nonmoving party must provide facts showing that there is a genuine issue for trial to avoid summary judgment. Id. at 324. "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." Id. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001); Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue."); Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006) ("In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

In considering these evidentiary materials, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Scott v. Harris, 550 U.S. 372, 378 (2007) (internal quotation marks and alterations

omitted). See also Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001) (when applying this standard, the court must examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment).

However, when considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson, 477 U.S. at 248, 255 ("only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249.

**Eighth Amendment Failure to Protect Standard**

The Eighth Amendment provides that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." Williams v. Bledsoe, 2013 WL 5522848, at * 18 (M.D. Pa. Oct. 3, 2013). See also Farmer v. Brennan, 511 U.S. 825, 832 (1994) (prison officials "must take reasonable measures to guarantee the safety of the inmates."). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Farmer, 511 U.S. at 834. "Still, not 'every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety.'" Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012) quoting Farmer, 511 U.S. at 834.

To establish a failure-to-protect claim under the Eighth Amendment, a plaintiff must show:

> (1) he was incarcerated under conditions posing a substantial risk of serious harm;
>
> (2) the official was deliberately indifferent to that substantial risk to his health and safety; and
>
> (3) the official's deliberate indifference caused him harm.

Id. In order to defeat a well-supported motion for summary judgment, the plaintiff "must present enough evidence to support the inference that the defendants 'knowingly and unreasonably disregarded an objectively intolerable risk of harm.'" Beers-Capitol v. Whetzel, 256 F.3d 120, 132 (3d Cir. 2001) quoting Farmer, 511 U.S. at 864. See also Barton v. Curtis, 497 F.3d 311, 334 (3d Cir. 2007) (in assessing a failure-to-protect claim on summary judgment, all inferences must be drawn in the light most favorable to the non-moving party.).

### 1) Conditions posing substantial risk of serious harm

The parties do not argue that Plaintiff was not imprisoned under conditions posing risk of serious harm. Indeed, because of his testimony against Thomas, it is clear that Plaintiff was incarcerated under conditions posing a substantial risk of harm to himself. The successful criminal prosecutions against both Thomas and Glass demonstrate that both men had a propensity for harming witnesses.

### 2) Deliberate indifference to the risk

Defendants argue that they are entitled to summary judgment because there is no evidence that they were deliberately indifferent to a substantial risk of harm to Plaintiff.

In this context, deliberate indifference is a subjective standard: "'the prison official-

defendant must actually have known or been aware of the excessive risk to inmate safety.'"
Bistrian, 696 F.3d at 367, quoting Beers-Capitol, 256 F.3d at 125. The actual knowledge requirement "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Beers-Capitol, 256 F.3d at 131, citing Farmer, 511 U.S. at 837. However, this requirement

> does not mean that a prison official can avoid liability by remaining deliberately indifferent to an excessive or substantial risk of serious harm to prisoners: […] Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.

Beers-Capitol, 256 F.3d at 131, quoting Farmer, 511 U.S. at 842.

A defendant's knowledge can be proven indirectly through circumstantial evidence, as explained by the Third Circuit:

> In fact, Farmer anticipated that a plaintiff could make out a deliberate indifference case by showing that prison officials simply were aware of a general risk to inmates in the plaintiff's situation: If an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant–official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk. […] Similarly, Farmer made clear that a prison official defendant cannot escape liability by showing that he did not know that *this* particular inmate was in danger of attack: "it does not matter … whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."

Beers-Capitol, 256 F.3d at 131, quoting Farmer, 511 U.S. at 842-43. See also Blackstone v. Thompson, 2014 WL 2581153, at *2 (3d Cir. June 10, 2014).

"Finally, a defendant can rebut a *prima facie* demonstration of deliberate indifference

either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." Beers-Capitol, 256 F.3d at 133, quoting Farmer 511 U.S. at 844.

### *Deliberate indifference of SCI Camp Hill Defendants*

Assistant District Attorney Barry's October 2007 letter to Superintendent Kelcher seeks special protections for Plaintiff and explains that:

> " … our confirmed information is that both [Thomas] and Kareem Glass (the friend for whom Thomas killed a witness) have a great deal of influence and connections, both inside and outside the prison system. In addition to the murder of one witness, we are currently investigating a number of incidents where local Corrections Officers and inmates have threatened and assaulted the witnesses against Mr. Thomas and Mr. Glass. […]
>
> [The] protection [afforded by separation orders] will be insufficient to protect against other third parties whom Mr. Thomas and Mr. Glass could solicit."

ECF No. 68-1, pages 2-3.

In their motion for summary judgment, the SCI Camp Hill Defendants argue that Plaintiff and Glass ended up in the same facility "due to a glitch in the system in which inmates are processed into and out of SCI Camp Hill." ECF No. 66, page 6. Defendants argue that this so-called "glitch" or "hole in the system" does not rise to the level of deliberate indifference. While the SCI Camp Hill Defendants did file an official DC-186 Separation form in paper form, the "glitch" resulted in that separation order being violated when Glass was assigned to the same facility where Plaintiff was housed.

The evidence before this Court reflects that when Superintendent Kelcher received the letter from Assistant District Attorney Barry, he forwarded the letter to Deputy Superintendent Ditty (not a Defendant in this case) and to Defendant Tim Henry, the Director of the Diagnostic

11

Center. ECF No. 68-1, Deposition of Donald Kelcher, page 16. Defendant Henry wrote on the Barry letter "Brian, please ensure separations filed. Tim. 11/5/07." ECF No. 68-1, Deposition of Timothy Henry, page 27.[4] Defendant Timothy Lehman, a corrections counselor, filed an official DC-186 Separation Form indicating that Plaintiff was to be separated from Donte Thomas and Kareem Glass. ECF No. 68-1, Deposition of Henry, page 35. See also ECF No. 68-1, page 35, DC-186 Separation File.

In his deposition, Henry explained the "glitch" or "hole in the system":

> I strongly believe that we did everything possible to protect Mr. Taylor from Mr. Glass by putting the information in his classification summary and then filing the DC-186. There was no way to track Mr. Glass because we didn't have a state identification number assigned yet, so we couldn't cross-reference Mr. Glass with Mr. Taylor at that time, but the information was in Mr. Taylor's file that he needed to be separated from Mr. Glass. […] at the time Mr. Taylor came through the classification center, there was no inmate number assigned to inmate Glass, so there was no way to get any automated system so that when inmate Glass did come in, that he could be identified as a separation need.

ECF No. 68-1, Deposition of Henry, pages 29, 31. In other words, "there was no way to cross-reference Taylor with Glass without Glass having a state identification number." Id. at page 31.

However, Defendants' focus on this "glitch"[5] as a defense or excuse for their failure to protect Plaintiff is inapposite. Kelcher and his subordinates were specifically notified by ADA Barry that a regular separation order from Glass and/or Thomas would not be sufficient to protect Plaintiff due to the wide circle of influence of them both. The record reflects that the SCI

---

[4] Brian is Defendant Brian Lubinski, a counselor supervisor.

[5] As explained by Defendants, this so-called glitch is a systemic failure rather a one-time inadvertent mistake and, presumably, has affected others.

12

Camp Hill Defendants attempted to enter a separation order from Thomas[6], but did nothing further to protect Plaintiff.

In order to defeat a well-supported motion for summary judgment, a plaintiff must present enough evidence to support the inference that the defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm. Beers-Capitol, 256 F.3d at 132. Here, Plaintiff has met that burden.

### *Deliberate indifference of SCI Forest Defendants*

The SCI Forest Defendants argue that they acted appropriately to protect Plaintiff after they were notified of Glass' presence at the facility by placing Glass into the RHU and transferring him to another institution. Defendants reason that:

> Plaintiff said nothing to Whitman about his fear about Glass' confederates. Moreover, the most Plaintiff expressed to Mongeluzzo was that he was fearful that somebody, unknown "homies" or "associates" of Glass, who may or may not be at SCI Forest may someday do something to him or not. That is an expression of a speculative fear that something may or may not happen in the future. That is not the type of information that allows a prison official to take any action and certainly does not place that official on notice that Plaintiff is in imminent danger of serious bodily harm.

ECF No. 66, pages 10-11. Defendants cite several cases for the proposition that "in order to be deliberately indifferent the Defendants had to consciously know of and disregard an excessive risk to the prisoner's well-being.' ECF No. 66, page 10. Interestingly, the cases cited by

---

[6] Although the DC-186 paper form was filed in Plaintiff's file, no separation from Glass or Thomas was entered into the Department of Corrections computer system until later. The record reflects that Defendant Brandt entered a notation indicating that Plaintiff should be separated from Donte Thomas on 12/3/2007 and made a similar entry regarding Kareem Glass on 4/2/**2009** (only after Plaintiff had identified Glass at SCI Forest and notified corrections staff). See ECF No. 75, pages 1-2. Defendants do not provide an explanation for the delay in the entry of the separations into the computer system. Furthermore, the evidence reflects that the paper Separation Order was not contained in all the appropriate files. See ECF No. 68-1, Deposition of Whitman, page 117 (stating that the paperwork should have been housed in Taylor's counselor's file and the main file, as well as copied to the files of Glass and Thomas).

13

Defendants focus on the vague or speculative fears of an inmate and are easily distinguishable from the factual situation at hand.

In Knox v. Dixon, 487 Fed.App'x 725 (3d Cir. 2012), the only one of Defendants' cases arising within the Third Circuit, Inmate Knox merely "alleged that he sent a request slip to a[n unnamed] prison official […] stating that 'someone in the jail' was going to hurt him," and he claimed that "several unnamed prison employees acted with deliberate indifference by failing to prevent the attack." Id. Knox's amended complaint was dismissed and reconsideration denied because

> [t]he facts, as alleged, fail to support a claim that the prison employees were aware of and disregarded any specific threat of harm prior to the attack. […] His allegations indicate that he warned prison officials of "threats" to his safety in only vague and speculative terms. He claims he sent a "request slip" to prison officials in April 2009 that stated: "I feel it is now best you place me in protected custody due to the serious nature of threats on my life." He also says that between April 2009 and July 2009 he wrote another request slip to the prison's superintendent "stating that I was in danger and would feel safer if I could move to CB with my cousin." The "request slips" are two conclusory statements with no underlying facts. No evidence exists that Knox told prison officials which other prisoners were making the threats or why they were doing so. Prison officials could not have been deliberately indifferent in the absence of facts indicating a substantial risk of harm to Knox.

Id. at 727-28 (internal citation omitted).[7]

---

[7] The additional cases cited by Defendants all arise out of district courts outside of the Third Circuit and hold no precedential value in this Court, even if they were on point with the present case. Three of these additional cases were dismissed upon initial screening based upon allegations of vague general fears of harm. See Coleman v. Tanner, 2012 WL 3138173, at *4 (E.D. La. 2012) ("His allegations that he has been labeled as an informant, which was also made in his prior lawsuit, with the result that he continues to hear threats from other inmates, provides no basis for a new claim; since in the Eighth Amendment context, mere threatening language or gestures ... do not, even if true, amount to constitutional violations."); Beasely v. Stephens, 2011 WL 2670189, at * 3 (S.D. Ill. 2011) ("Plaintiff's complaint does not include any allegation that he suffered any actual attack or harm at the hands of another inmate, much less that he received any specific threat of harm or alerted prison officials to any such threat. A vague, general fear of harm that is not based on a specific threat is not enough to state a cause of action for deliberate indifference or failure to protect."); and Wright v. Clark, 2009 WL 347293, at * 5 (E.D. Cal. 2009) ("It appears that when Plaintiff was first given double-cell status, he did not know the

identity of his future cell-mate, therefore Plaintiff's fears were not based on a pre-existing conflict with a particular inmate. Nor does Plaintiff indicate that he was particularly susceptible to violent disputes with his cell-mates due to his personality or other characteristic. Plaintiff's speculation regarding his compatibility with his future, yet-to-be-determined cell mate does not constitute a "serious threat" to his safety, nor does defendants' refusal to buy into Plaintiff's arguments constitute "deliberate indifference". […] Nor does it constitute "deliberate indifference" when prison officials determine that a prisoner should not be single-celled when he reports that he is currently getting along with his cell mate but has vague and unsubstantiated fears regarding his future safety.").

In the other two cases cited by Defendants, summary judgment was granted in favor of corrections defendants, but again the analysis focused on vague threats of harm not found in the present case. In Alston v. Lewis, the district court concentrated on the second prong of the Eighth Amendment analysis, finding that

> The record reflects that plaintiff filed grievances and letters complaining to prison officials that he was being sexually harassed and assaulted by prison staff and other inmates, but the record also reflects that prison officials investigated the alleged threats and found that his allegations lacked support. Although disputed by plaintiff, the record also reflects that plaintiff was offered the option of going into protective custody, but refused. Additionally, prison staff repeatedly asked plaintiff if he feared for his safety, and plaintiff responded that he did not. Further, plaintiff admits that prison officials responded to his complaints of threats from one particular inmate by transferring that inmate to F-dorm. Aside from the incident regarding the inmate that was transferred to F-dorm, the record contains only general allegations of plaintiff's speculative fears and vague conclusory allegations regarding threats. Plaintiff does not allege that he provided defendants any specific facts to indicate that he was at a significant risk of suffering serious harm at the hands of any other inmate. Moreover, plaintiff has not provided any specific factual allegations to this court to reflect any specific threat to his safety. Plaintiff's conclusory allegations regarding defendants' alleged deliberate indifference to threats, discrimination, and harassment from staff and other inmates are not sufficient to state an Eighth Amendment claim.

Alston v. Lewis, 2012 WL 3704934, at * 6-7 (E.D. N.C. 2012).

In Froiseth v. County of LaCrosse, Wisconsin, the district court held

> It is undisputed that plaintiff filled out a written request form on April 3, 2004, in which he asked to be moved because he felt threatened and did not feel safe in the "A" housing block. However, it is also undisputed that plaintiff did not explain *why* he felt threatened. He did not mention […] any […] inmates by name […]and did not indicate that Reid and Stokes had fought with Colbert or that Reid had threatened plaintiff when he attempted to intervene. He did not write, even in general terms, that he feared being assaulted. Plaintiff may have feared the consequences of speaking out, but by not doing so, he failed to give jail officials

15

The SCI Forest Defendants argue that Mr. Taylor's "nebulous concerns for his safety are of the same nature as those found in Knox." ECF No. 66, page 11. Defendants' argument is disingenuous as the record reflects that Plaintiff's situation is much different than that in Knox. Here, there were facts indicating a substantial risk of harm to Plaintiff as evidenced by the Barry letter specifically detailing Plaintiff's cooperation and testimony against Glass and Thomas for the murder of a witness, the great deal of influence held by both men and the ongoing and "unusual" investigation[8] of correctional officers and inmates threatening and assaulting other witnesses against Glass and Thomas. Furthermore, the Barry letter specifically stated that separation orders "will be insufficient to protect against other third parties whom Mr. Thomas or Mr. Glass could solicit" and warned that additional steps "must be taken to assure Mr. Taylor's safety." The risk of substantial bodily harm to Plaintiff was the exact opposite of nebulous or vague. Additionally, these threats were credible as Thomas and Glass had already demonstrated a propensity toward murdering witnesses against them.

Although the SCI Forest Defendants may not have been initially aware of the request for separations that should have followed Plaintiff from SCI Camp Hill, once they were made aware of the danger they needed to do something to protect Plaintiff from Glass as well as from those Glass solicited. Besides the dire warning in the Barry letter (which Whitman acknowledges he

---

> notice of the threat he faced. A vague expression of fear unaccompanied by any specifics does not give jail officials the knowledge necessary to support a deliberate indifference claim.

Froiseth v. County of LaCrosse, Wisconsin, 2006 WL 1236714, at *9 (W.D. Wis. 2006) (internal citation omitted).

[8] Defendant Henry, Director of the Diagnostic Center, acknowledged that it "is very rare" that correctional officers would have been involved with prisoners in assisting them to retaliate against other inmates. ECF No. 68-1, Deposition of Tim Henry, page 31.

16

failed to read thoroughly)[9], Plaintiff swears that he told several prison staff members that danger could be coming from associates of Glass. See ECF No. 68-1, Plaintiff's Deposition, page 66

---

[9] In his deposition, Whitman described the Assistant District Attorney's letter as what "triggered [him] as to a situation [between Plaintiff and Glass and Thomas]." ECF No. 68-1, at page 110.

> QUESTION: I'll just read it [the Assistant District Attorney's letter] into the record here,
> > *"While Mr. Thomas is currently in segregated custody, our confirmed information is that both he and Kareem Glass, the friend for whom Thomas killed a witness, have a great deal of influence in connection both inside and outside the prison system. In addition to the murder of one witness, we are currently investigating a number of incidents where local Corrections officers and inmates have threatened and assaulted the witnesses against Mr. Thomas and Mr. Glass."*
>
> Now, is it my understanding that you would have read that information?
>
> WHITMAN: Basically when I got the letter I pretty much saw where they wanted him separated and that's what I ran with at that time. **I didn't delve into the whole letter, no.**

Id. at 111 (emphasis added).

Whitman explained that when he came across the separation order in March of 2009, he took it to the unit manager. Id. at 109. Whitman acknowledges that he did not have any discussions with anybody regarding the "possible connections with Kareem Glass." Id. at 111. When questioned as to the reason for not having these discussions, Whitman explained

> "at the time I guess when it was brought to me I wasn't sure who Kareem Glass was. Mr. Taylor claimed he saw him in the institution and then when I found the paperwork, I took it to my next level to make them aware of it and the decision was to get Mr. Glass out of the institution; so no, at the time, I did not think it was, you know, **because I didn't really read the whole letter,** I just saw the fact they did not want him in the same institution as that individual and that was – my goal was to make sure that one of those individuals was separated."

Id. (emphasis added). In a follow-up question, Whitman was asked "when you read the letter from the DA using the word "connections" and all that, you said that didn't make an impression on you or you didn't read that?" Whitman replied:

(requesting that Whitman "ship me out because [Glass] already spread my name around the jail, and […] he got a lot of his friends in here like that. [Whitman] said … you'll be all right. Don't worry about it."); page 81 (to Whitman, requesting protected custody after Glass put in RHU "because he already have been spreading my name around the jail."); page 82 (telling Riskus, "word is […] dudes going around talking about – I mean, trying to find out who I am […] And he said, well, you don't got to worry about that he said, because we shipped the guy out. We can't help who his friends is. He said we can't ship the whole prison out. So, you know, that's that."); page 95 (telling Frye "they trying to find out who I am"). Security Captain Mongelluzzo testimony supports Plaintiff's contention as Mongelluzzo acknowledges that Plaintiff expressed concerns for his safety and informed him that Glass had been asking around the prison for Taylor's whereabouts and "that Glass could have his homies up here and may be out to get him because he [Taylor] testified against him […]". ECF No. 68-1, page 131.

Here, Plaintiff has met his burden of presenting enough evidence to support the inference that Defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm. See Beers-Capitol, 256 F.3d at 132. The reasonableness of the SCI Forest Defendants' actions in this regard remains a question for the jury.

**3) Resulting Harm**

Defendants argue that the assault upon which this lawsuit is based did not occur or was staged by Plaintiff. In support of this position, Defendants cite deposition testimony from

---

> Basically when I found that letter that he was referring to, I was kind of shocked at first because, you know, that stuff should have been caught at Camp Hill rather than get to my level, **but I saw the fact in there that the Judge as well as the DA in separate letters wanted him separated from those individuals and that is basically where I stopped**. As soon as I saw that, I went to my supervisor who was Mr. Graham, told him what was going on and we needed to do something […]

Id. at 115 (emphasis added).

Mongelluzzo and Whitman. See ECF No. 68-1, Deposition of Mongelluzzo, pages 134, 137 (describing Plaintiff's injury as a scratch, perhaps self-inflicted); pages 134-136 (explaining that when inmates generally attack each other with razors, the resulting injuries occur on the face/head); page 136 (even though inmates "love to talk," no confidential informants ever approached Mongelluzzo with details of the assault); and ECF No. 68-1, Deposition of Whitman, page 115 (claiming that he "heard an opinion from the medical department when Mr. Taylor was seen by medical following this incident, that they felt that his injuries were more consistent with self-inflicted than an actual assault," but also saying he could not remember who told him this and never saw that statement in writing.).

In spite of the evidence cited by Defendants in support of their contention that no assault occurred, other evidence (created by Department of Corrections personnel) supports the position that there was an attack by other inmates and that Plaintiff suffered injuries therefrom. See ECF No. 75, page 2 (notation by Defendant Brandt that Plaintiff received "a significant laceration"); ECF No. 75-1, page 1 (report by Lt. Mongelluzzo of Security Office dated April 22, 2009, noting that Plaintiff received an "approximately 12 to 14 inch cut on his right arm" during an attack by an unknown assailant); and ECF No. 75-2, page 1 (injury/incident report dated April 16, 2009 (the date of the attack) noting two lacerations (one twelve inches and one five inches) on Plaintiff's right forearm).

Whether or not there was an assault is a genuine issue of material fact and such a disputed issue precludes the grant of summary judgment. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SAMUEL TAYLOR,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 10-139 Erie** |
| | ) | |
| v. | ) | |
| | ) | |
| **MICHAEL BARONE, et al,** | ) | **Magistrate Judge Susan Paradise Baxter** |
| **Defendants.** | ) | |

**O R D E R**

AND NOW, this 11th day of September, 2014;

IT IS HEREBY ORDERED that the motion for summary judgment [ECF No. 65] be DENIED. A status conference will be scheduled by separate order.

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge